**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| **MARSHALL HUNN** | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. 5:12-CV-081-C |
| | § | |
| **DAN WILSON HOMES, INC**. | § | |
| Defendant | § | |
| | § | |
| **DAN WILSON** | § | |
| Defendant | § | |
| | § | |
| **BEN J. LACK** | § | |
| Defendant | § | |

**WILSON DEFENDANTS' SUPPLEMENTAL PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TO THE HONORABLE JUDGE CUMMINGS:**

**NOW COMES** Defendants Dan Wilson Homes, Inc. and Dan Wilson and pursuant to this Court's Bench Order of November 6, 2013, submit their Supplemental Proposed Findings of Fact and Conclusions of Law:

**A.**
**Supplemental Proposed Findings of Fact**

*The Agreements between the Parties*

1.      Defendant Dan Wilson is President and owner of Defendant Dan Wilson Homes, Inc., a construction company based in Lubbock, Texas that specializes in building custom residences.  Clients typically hire Dan Wilson Homes to build specific residences for themselves that are planned, customized, and designed by the clients and Dan Wilson Homes. (Trial Tr., vol. 1, 250:22-25; 253:2-16; 254:11-15.)  Dan Wilson Homes is hired by its clients prior to engaging draftsmen on a particular project.  (Trial Tr., vol. 1, 251:13-25; 252:1-3.)   A number of

subcontractors, including draftsmen, are hired by Dan Wilson Homes to contribute work towards individual projects. (Trial Tr., vol. 2, 274:22 – 275:9.)

2.      In 2011, Dan Wilson Homes foresaw a need for hiring a draftsman to work on plans for some of Dan Wilson Homes' clients.  (Trial Tr., vol. 2, 292:23 – 295:16.)   Upon recommendation by another builder, Dan Wilson contacted Ben Lack, a draftsman employed by Marshall Hunn, regarding the possibility of hiring Ben Lack in the future.  (*Id.*)  Dan Wilson had no business relationship with Marshall Hunn, so he also called Marshall Hunn and stated that he had heard good things about Ben Lack, and would like to set up a meeting to discuss placing a few projects with Hunn Designs.  (Trial Tr. vol. 3, 571:10 – 572: 23).   This prompted a meeting with Marshall Hunn, Ben Lack, Dan Wilson and one other to review Ben Lack's portfolio.  *Id.* At this meeting, or shortly thereafter, Dan Wilson Homes agreed to let Ben Lack do some of his design work; however, he never guaranteed or led Hunn Designs to believe that it would be the exclusive designer for the company.  *Id.*

3.      Dan Wilson, Ben Lack, and Marshall Hunn established that if Dan Wilson Homes decided to hire Ben Lack for a particular project then Dan Wilson Homes would pay Marshall Hunn a fee of $1.25 per square foot of air-conditioned living space of the constructed residence for Ben Lack's drafting services.  (Trial Tr., vol. 2, 292:23 – 295:16.)   Marshall Hunn's responsibilities were to provide quality plans in a timely manner with a license for Dan Wilson Homes to use the plans to build the homes for which the made-to-order plans were created. (Trial Tr., vol. 3, 576:3 – 583:5.)  Dan Wilson also discussed with Marshall Hunn that Ben Lack would meet with the clients at Dan Wilson Homes' offices, Ben Lack would work on projects selected by Dan Wilson Homes, and Ben Lack would draft plans as directed by Dan Wilson Homes and its clients.  (Trial Tr., vol. 2, 292:23 – 295:16.)

4.      No discussion of copyright or intellectual property rights took place at this meeting.  (Trial Tr., vol. 2, 295:17 – 296:3.)   Dan Wilson made it clear to Marshall Hunn that Dan Wilson would be directing the design work from what his clients requested and would not need any pre-designed plans from Marshall Hunn.  (*Id.*)

5.      Marshall Hunn made Ben Lack the "point person" for Dan Wilson Homes, and Ben Lack had the right to accept work from Dan Wilson Homes on behalf of Hunn Designs.  (Trial Tr., vol. 1, 126:11 –  127:24; vol.2, 296:4-12; vol. 3, 572:24 – 573:5.)  Ben Lack was the authorized agent for Hunn Designs and had full authority to transact all business with Dan Wilson Homes on its behalf.  (Trial Tr., vol. 3, 572: 16 – 574:13.)

6.      Dan Wilson had a specific belief that the license involved in these projects allowed Dan Wilson Homes to use the made-to-order plans to build his clients' custom homes regardless of whether Marshall Hunn or his employees completed the plans, as long as he paid for the work performed.  (Trial Tr., vol. 2, 278:11-25.)  Any interpretation of the agreement that would have allowed Marshall Hunn to revoke the license and stop the construction project in the event of a dispute would have been, in Dan Wilson's opinion, "insane" and "there would have been no further discussion of using Marshall Hunn as a subcontractor."  (Trial Tr., vol. 2, 297:23-298:18).  This is because Dan Wilson Homes was responsible for getting the custom homes built on time to the clients' specifications and the plans were specific to and designed by the clients.  (*Id.*) Any limitation on the license that would allow Marshall Hunn to prevent Dan Wilson Homes' clients from building their homes as depicted in the plans would have defeated the purpose of the custom home projects and been contrary to the intent of the parties.  (Trial Tr., vol. 2, 299:4-9, 476:18-477:7).   Marshall Hunn never communicated to Dan Wilson any conditions on the granted license.  (Trial Tr., vol. 3, 583:3-5.)

3

7.     Ben Lack had the same understanding as Dan Wilson of Dan Wilson Homes' right to complete and use partially completed plans as that was Ben Lack's practice and experience in his work as a draftsman at his prior job.  (Trial Tr., vol. 1, 126:25 – 129:9.) Marshall Hunn gave no instruction or training to Ben Lack to the contrary. (Trial Tr., vol. 1, 114:4 – 115:16.)  With this understanding in place, Dan Wilson Homes then hired Ben Lack to work on several projects for clients of Dan Wilson Homes.  (Trial Tr., vol. 2, 273:6-25.)

***The Brown Residence***

8.     Lacy and Bobby Brown hired Dan Wilson Homes to build a custom residence after being referred by Lacy Brown's mother.  (Trial Tr., vol. 3, 645:4-9.)  Lacy Brown had made sketches of her future house and had spent a long time working on its design.  (Trial Tr., vol. 3, 644:4 – 644:20.)  Her father, Gary Greenstreet, is a local semi-retired builder with drafting experience, and he took Lacy Brown's sketches and ideas and drafted several potential floor plans for his daughter.  (Trial Tr., vol. 3, 701:4 – 703:22.)    Lacy Brown decided to build one of these plans, and Gary Greenstreet drew that plan in full detail to scale and also added a site plan and partial front elevation to the drawing.  (Trial Tr., vol. 3, 704:2 – 705:5.)    Lacy and Bobby Brown then hired Dan Wilson Homes to build the house drawn by Gary Greenstreet. (Trial Tr., vol. 3, 705:17 – 706:12; Trial Tr., vol. 2 286:7 – 287:13.)

9.     After establishing a relationship with the Browns, Dan Wilson hired Ben Lack to copy Gary Greenstreet's drawing of the Brown Residence into AutoCAD. (Trial Tr., vol. 3 649:4-15; 652:22 – 653:4.)  Lacy and Bobby Brown had no relationship with Ben Lack or Marshall Hunn prior to meeting Ben Lack in Dan Wilson's office related to this construction project.

4

10.     Dan Wilson and the Browns provided the Greenstreet drawing and other materials to Ben Lack and instructed him to proceed with drafting plans in accordance with Dan Wilson and the Brown's instructions.  Ben Lack did not contribute any design ideas to the plans.  (Trial Tr., vol. 2, 305:2-20.)  Ben Lack made an initial preliminary drawing that was a copy of the Greenstreet drawing and delivered it without restriction to the Browns and Dan Wilson.  (Trial Tr., vol. 3, 652:22 – 653:10.)  Ben Lack then made another preliminary drawing at the direction of the Browns with some minor changes, which was eventually rejected by the Browns. (*Id.*) This rejected drawing that was substantially similar to the original Greenstreet drawing was the plan for which Marshall Hunn obtained a copyright registration.  (Trial Tr., vol. 3, 706:13 – 708:4.)

11.     With the Brown plans in this state, Ben Lack's employment with Marshall Hunn was terminated and Marshall Hunn refused to complete the plans in a timely manner.  (Trial Tr., vol. 2, 328:19 –329:17.)  The Browns decided to return to the original plan copied from Gary Greenstreet's drawing, and Dan Wilson retained Ben Lack to make this minor reversion and to complete the plans.  (Trial Tr., vol. 3, 652:22 – 653:10.)  Dan Wilson Homes then used such plans to build the custom residence for which the plans were created.  (Trial Tr., vol. 2, 351:23 – 352:2.)

12.     Marshall Hunn never invoiced Dan Wilson Homes for work performed on the Brown plans despite Dan Wilson's repeated requests for an invoice.  (Trial Tr., vol. 2, 339:2 – 19.)  Dan Wilson Homes then estimated the amount due for the work performed and tendered payment in the amount of $4,198.75 to Marshall Hunn.  (Trial Tr., vol. 2, 339:20 – 343:25.)

13.     Marshall Hunn registered the rejected drawing made by Ben Lack as his own work even though it was a substantially similar copy of the drawing made by Gary Greenstreet.

(Trial Tr., vol. 3, 706:13 – 708:4.)   Marshall Hunn then sued Dan Wilson and Dan Wilson Homes claiming ownership and infringement of what was actually Gary Greenstreet's work. (Trial Tr., vol. 2, 474: 3-13.)   Learning of this false claim by Marshall Hunn, Gary Greenstreet assigned to Dan Wilson Homes rights to the Greenstreet drawings and rights to pursue claims against Marshall Hunn.   (*Id.*)   Dan Wilson Homes then registered the Greenstreet drawings with the United States Copyright Office.   (Trial Tr., vol. 3, 693:4 – 694:14.)

***The McGee Residence***

14.     Nat McGee hired Dan Wilson Homes to build a custom residence after being referred by Mr. and Mrs. Lott, prior clients of Dan Wilson Homes.   (Trial Tr., vol. 2, 279: 7 – 286: 4.)   Nat McGee asked Dan Wilson Homes to incorporate specific aspects of the Lott Residence along with a floor plan sketch made by Nat McGee as well as numerous other design details.   (*Id.*)   After establishing a relationship with Nat McGee, Dan Wilson hired Ben Lack to make drawings of the McGee Residence to meet design specifications provided solely by Nat McGee and Dan Wilson.   (*Id.*)   Nat McGee had no relationship with Ben Lack or Marshall Hunn prior to meeting Ben Lack in Dan Wilson's office.   (*Id.*)   Dan Wilson and Nat McGee provided the Lott Plan, Nat McGee's drawing (which was submitted by Plaintiff in his copyright application), and other materials to Ben Lack and instructed him to proceed with drafting plans in accordance with Dan Wilson and Nat McGee's instructions.   (*Id.*)   Ben Lack made a number of preliminary drawings that were delivered weekly without restriction to Nat McGee and Dan Wilson.   (Trial Tr., vol. 2, 313:1 – 317:5.)   Ben Lack did not contribute any design ideas to the plans.   (Trial Tr., vol. 2, 305:2-20.)

15.     The McGee plans were nearing completion when Ben Lack's employment with Marshall Hunn was terminated and Marshall Hunn refused to complete the plans in a timely

manner.  (Trial Tr., vol. 2, 328:19 –329:17.)    At about that time, Nat McGee became engaged to Charlie Winder.   (Trial Tr., vol. 2, 461:7 – 462: 3.)   This pending change in marital status required the plans to be reworked.  (Trial Tr., vol. 2, 461:7 – 462: 3.)  Dan Wilson retained Ben Lack to make these significant changes and to complete the plans.

16.     Marshall Hunn never invoiced Dan Wilson Homes for work performed on the McGee plans despite Dan Wilson's repeated requests for an invoice.  (Trial Tr., vol. 2, 339:2 – 19.)  Dan Wilson Homes then estimated the amount due for the work performed and tendered payment in the amount of $3,985.00 to Marshall Hunn. (Trial Tr., vol. 2, 339:20 – 343:25.)

17.     The revised McGee plans (also referred to as the Winder plans) that were used by Dan Wilson Homes had numerous substantial design changes throughout the residence and to the front elevation as evidenced by a comparison of Plaintiff's Exhibit 28 to Defendants' Exhibit 2 (as recorded in Defendants' Exhibit 2A).   (Trial Tr., vol. 2, 391:18 – 402:25.)   Dan Wilson Homes did not copy the McGee plans for which Marshall Hunn obtained a copyright registration.  (*Id.*)  The Winder plans used by Dan Wilson Homes were not substantially similar to the registered McGee plans.  (*Id.*)  Dan Wilson Homes' only use of the Winder Plans was to build the custom residence for which the plans were created.  (Trial Tr., vol. 2, 351:17-22.)

### *The Jeffers Residence*

18.     Kim and Steve Jeffers hired Dan Wilson Homes to build a custom residence based upon an interview with Dan Wilson. (Trial Tr., vol. 1, 260:4 – 261:11.)   The Jeffers required Dan Wilson Homes to build a residence that satisfied a lengthy room-by-room list of customized requirements and design ideas gathered by Kim Jeffers. (Trial Tr., vol. 2, 269:17 – 271:9.)  Dan Wilson then drew a "bubble drawing" of general room layouts and otherwise refined the preliminary design of the residence.  (Trial Tr., vol. 2,  271:10 – 274: 11.)  After

establishing a relationship with the Jeffers, Dan Wilson hired Ben Lack to make drawings of the Jeffers Residence to meet design specifications provided solely by the Jeffers and Dan Wilson. (*Id.*) The Jeffers had no relationship with Ben Lack or Marshall Hunn prior to meeting Ben Lack in Dan Wilson's office. (*Id.*) Ben Lack did not contribute any design ideas to the plans. (Trial Tr., vol. 2, 305:2-20.)

19. Dan Wilson provided the bubble drawing, design requirements, and other materials to Ben Lack and instructed him to proceed with drafting plans in accordance with Dan Wilson and the Jeffers' instructions. (Trial Tr., vol. 2, 271:10 – 274: 11.) Ben Lack made a preliminary floor plan that was delivered without restriction to the Jeffers and Dan Wilson. (Trial Tr., vol. 2, 313:1 – 317:5.)

20. The Jeffers plans were at an early stage of development when Ben Lack's employment with Marshall Hunn was terminated, and Marshall Hunn refused to complete the plans in a timely manner. (Trial Tr., vol. 2, 328:19 –329:17.) Dan Wilson retained Ben Lack to make significant changes to the preliminary floor plan and to complete the plans.

21. Marshall Hunn never invoiced Dan Wilson Homes for work performed on the Jeffers plans despite Dan Wilson's repeated requests for an invoice. (Trial Tr., vol. 2, 339:2 – 19.) Dan Wilson Homes then estimated the amount due for the work performed and tendered payment in the amount of $1,930.50 to Marshall Hunn. (Trial Tr., vol. 2, 339:20 – 343:25.)

22. The finalized Jeffers plans that were used by Dan Wilson Homes had numerous substantial design changes throughout the residence and bear little resemblance to the preliminary drawing registered with the U.S. Copyright office by Marshall Hunn, as evidenced by a comparison of Plaintiff's Exhibit 48 to Defendants' Exhibit 4 (as recorded in Defendants' Exhibit 4A). (Trial Tr., vol. 2, 382:24 – 391:17.) Dan Wilson Homes did not copy the Jeffers

plans for which Marshall Hunn obtained a copyright registration. (*Id.*) The final Jeffers plans used by Dan Wilson Homes were not substantially similar to the registered Jeffers plans. (*Id.*) Dan Wilson Homes' only use of the Jeffers plans was to build the custom residence for which the plans were created. (Trial Tr., vol. 2, 351:11-16.)

***The Showcase Home***

23.    Just prior to Ben Lack's departure from Marshall Hunn's employment, Dan Wilson Homes decided to build a highly-customized residence on speculation to be included in a real estate showcase exhibition in Lubbock's Lakeridge South subdivision. (Trial Tr., vol. 2, 305:21 – 309:20.) Dan Wilson started his design of the Showcase Home from a stock plan titled #3016 that had been drawn by a third-party architect, Michael Dertein. (*Id.*) Dan Wilson asked Ben Lack to make a preliminary sketch from this stock plan that incorporated several initial design changes. (*Id.*) This preliminary sketch was then to serve as a starting point for a fully customized design at Dan Wilson's direction. (*Id.*) Ben Lack did not contribute any design ideas to the plans. (Trial Tr., vol. 2, 305:2-20.)

24.    With only this preliminary sketch completed, Ben Lack's employment with Marshall Hunn was terminated, and Marshall Hunn refused to produce the plans in a timely manner. (Trial Tr., vol. 2, 328:19 –329:17.) Dan Wilson retained Ben Lack to initiate the drawing process for the Showcase Home plans.

25.    The finalized Showcase Home plans that were used by Dan Wilson Homes had numerous substantial design changes throughout the residence and bear little resemblance to the preliminary sketch registered with the U.S. Copyright office by Marshall Hunn, as evidenced by a comparison of Plaintiff's Exhibit 42 to Defendants' Exhibit 3 (as recorded in Defendants' Exhibit 3A). (Trial Tr., vol. 2, 364:15 – 382:23.) Dan Wilson Homes did not copy the Showcase

Home sketch for which Marshall Hunn obtained a copyright registration.  (*Id.*)  The final Showcase Home plans used by Dan Wilson Homes were not substantially similar to the registered Showcase Home sketch.  (*Id.*)  Dan Wilson Homes' only use of the Showcase Home plans was to build the custom residence for which the plans were created.  (Trial Tr., vol. 2, 352:3-7.)

### Marshall Hunn Granted Wilson Defendants a License to Use the Plans

26.     Construction truly began on these projects before Ben Lack was hired (Trial Tr. vol. 1, 122:3-8; 257:15 – 258:10.)  Before any project was entrusted to Hunn Designs by Dan Wilson Homes, and the respective homeowner for each project, there was an initial meeting between the Homeowner, Dan Wilson and Ben Lack.  (Trial Tr. vol. 1, 120:8-11.)  Each homeowner had already done considerable work before the initial meeting.  (Trial Tr. vol. 1, 121:15-18.)  The homeowners came to the initial meeting with plans, pictures and ideas of what they want their house to be.  (Trial Tr. vol. 1, 121:4-14.)  Also prior to the initial meeting, each homeowner had already selected Dan Wilson Homes to build their house.  (Trial Tr. vol. 1, 121:19 – 122:2; 251:13 – 25.)  The initial meeting was, essentially, an interview by the homeowner of Ben Lack.  (Trial Tr. vol. 1, 120:8-11.)  Once Ben Lack was hired, it was his job to draw the homeowners' dreams and ideas, which would be used by Dan Wilson Homes to construct the same.  (Trial Tr. vol. 1, 122:9 – 123:1.)

### Meeting of Minds

27.     Prior to beginning work with Hunn Designs, Ben Lack had nine years of experience as a designer.  (Trial Tr. vol. 1, 112:19 – 114:112.)  Hunn did absolutely nothing to change Ben Lack's perceptions he had when he began his job.  (Trial Tr. vol. 1, 114:15 – 115:16.)  In fact, Ben Lack observed Hunn take other architect's plans, copy them into

AutoCAD, print them and pass them off as his own, (which presumably left the impression that copyright protections where not important to Hunn Designs).  (Trial Tr. vol. 1, 115:17 – 116:13.) When Ben Lack accepted each new project from Dan Wilson Homes on behalf of Hunn Designs, he did so with the understanding that Dan Wilson Homes could replace him and take the unfinished work to another designer to complete, so long as Dan Wilson Homes paid Hunn Designs. (Trial Tr. vol. 1, 126:11 – 127:24.)

28.     As the authorized representative of Hunn Designs, Ben Lack never said anything to Dan Wilson contrary to the notion that Dan Wilson Homes could take unfinished work to another designer to complete.   (Trial Tr. vol. 1, 127:25 – 128:3.)   As the authorized representative of Hunn Designs, Ben Lack felt that Dan Wilson Homes could use unfinished plans in a variety of ways.  (Trial Tr. vol. 1, 128:4 – 14.)  In fact, much of these beliefs stemmed from Ben Lack's belief that the work, finished or unfinished, was the property of the homeowners because it was their ideas.  (Trial Tr. vol. 1, 128:22 – 129:13.)  Dan Wilson had the same understanding; a meeting of the minds occurred between Ben Lack on behalf of Hunn Designs and Dan Wilson Homes when the oral contracts where formed.  (Trial Tr., vol. 2, 297:23-298:18.)

### *Separate Agreements*

29.     Each of the projects accepted by Hunn Designs became separate oral contracts. (Trial Tr. vol. 3, 574:21-23.)  Dan Wilson Homes was obligated to pay for complete plans, as well as incomplete work, implying a right to use the incomplete work.  (Trial Tr. vol. 3, 575:18 – 576:2.)  Dan Wilson Homes had the right to fire Hunn Designs, and get out of these contracts, if Hunn Designs did not complete its plans in a reasonable amount of time.  (Trial Tr. vol. 3, 581:9 – 582:4.)  Marshall Hunn admitted that each contract had an element wherein Dan Wilson

11

Homes was, or would be, granted a license to use work created by Hunn.  (Trial Tr. vol. 3, 582:18 – 20.)  Despite disagreements by his authorized agent, Marshall Hunn contends the contractual license would not vest until some condition precedent occurred.  (Trial Tr. vol. 3, 582:21 – 583:2.)  However, Marshall Hunn admits that this conditions precedent was never communicated to Dan Wilson Homes.  (Trial Tr. vol. 3, 583: 3 – 5.)

*Delivery*

30.     As soon as revisions were made to drawing, they were delivered to Dan Wilson Homes.  (Trial Tr. vol. 1, 131:23 – 132:20.)   This was the routine of Hunn Designs, according to Marshall Hunn.  (Trial Tr. vol. 3, 586:15 – 587:13.)   Further, Ben Lack had full authority of Hunn Designs to make these deliveries.  (Trial Tr. vol. 3, pg. 587:14 – 22.)  The reason they were delivered to Dan Wilson Homes, according to Marshall Hunn, was because the construction project was a "team job." (Trial Tr. vol. 3, 589:3 – 5.)

*Permission (Intent) to Use Delivered Documents*

31.     Once delivered, Hunn Designs understood they would be used in conjunction with the overall goal of completion of the construction project.  (Trial Tr. vol. 1, 132:21 – 133:24; Trial Tr. vol. 3, 587:23 – 588:14.)  Hunn Designs granted permission to Dan Wilson Homes to use the delivered unfinished drawings as needed.   (Trial Tr. vol. 1, 133:25 – 134:4.) Furthermore, no restrictions were put on Dan Wilson Home's ability to use these delivered drawings.  (Trial Tr. vol. 1, 134:5 – 10.)   In fact, these unfinished drawings were delivered without any stamp or marking on them indicating any copyright rights of Hunn Designs.  (Trial Tr. vol. 3, 588:15 – 23; and, 589:9 – 14.)   Marshall Hunn admitted that there were not any stipulations given to Dan Wilson Homes about what it could not do with the delivered unfinished drawings.  (Trial Tr. vol. 3, 589:9 – 14; and, 589:15 – 590:1.)

*Lack of Nexus between Marshall Hunn's Services and Wilson Defendants' Profits*

32.    Wilson Defendants' builder's fees (their sole source of profits) were fixed or diminishing fees; therefore, the line item expense for drafting services in each project did not affect the builders' fees.  (Trial Tr., vol. 2, 407:2 – 431:11.)   The choice to use Ben Lack's drafting services through Marshall Hunn's business did not affect Wilson Defendants' builder's fee.  (*Id.*)   The choice to hire Ben Lack to complete the plans did not affect Wilson Defendants' builder's fee.  (*Id.*)

*Marshall Hunn's Refusal of Wilson Defendants' Attempts at Resolution*

33.    After the dispute arose Dan Wilson offered four potential solutions: 1) Marshall Hunn could keep Ben Lack temporarily employed (or as an independent contractor) for the purpose of completing the plans at issue; 2) Dan Wilson could hire Marshall Hunn and pay both Marshall Hunn and Ben Lack for the respective work completed; 3) Marshall Hunn could complete the work himself; and 4) Marshall Hunn could stamp and print the final plans and receive full payment from Dan Wilson Homes as if Marshall Hunn had completed the work. (Trial Tr., vol. 2, 328:19 – 329:17; 345:12 – 346:2.)  Marshall Hunn refused all of these possible methods of resolving the dispute. (*Id.*)

34.    Marshall Hunn claims that he offered to complete the plans himself, but he admits that he told Dan Wilson, "I'm not a hundred percent sure when I can get to them," that his wife gave Dan Wilson a belligerent lecture on copyright law during the attempted negotiations, and that he delivered a letter to Dan Wilson the morning of the meeting that stated "the ability of Hunn to complete the existing designs" had been impaired or destroyed.  (Trial Tr., vol. 3, 566:1-22; 569:13 – 570:5; 596:8-9.)

*The Breach of Contract Claim*

35.    Plaintiff and Dan Wilson Homes had four separate agreements that Plaintiff would draft the Jeffers, Brown, McGee/Winder, and Showcase Home plans in a reasonable time, and Dan Wilson Homes would pay Plaintiff $1.25 a square foot for the plans upon completion. (Trial Tr. vol. 2, 293:17-295:16; Trial Tr. vol. 3, 572:17-577:9.)

36.    Plaintiff did not finish the drawings for any of the four plans at issue. (Trial Tr. vol. 1, 51:7-52:6.)  Plaintiff did not have the ability to complete the four plans at issue.  (Trial Tr. vol. 2, 328:19-332:8; Trial Tr. vol. 3, 569:1-570:5.)

37.    Dan Wilson requested that Plaintiff invoice Dan Wilson Homes for work performed by Plaintiff on the four plans at issue.  (Trial Tr. vol. 2, 337:14-340:6.)  Plaintiff never sent the requested invoices to Dan Wilson Homes. (Trial Tr. vol. 2, 337:14-340:6.)

38.    Dan Wilson Homes presented a payment to Plaintiff based on $1.25 a square foot times the percentage of completion by Plaintiff on the four plans at issue.  The total tendered by the Wilson Defendants to Plaintiff was $10,114.25 broken down as follows: McGee/Winder plan payment, $3,985.00; Brown plan payment, $4,198.75; Jeffers plan payment, $1,930.50; Showcase plan payment, $0.00.  (Trial Tr. vol. 2, 339:24-343:25.)  Plaintiff mailed Dan Wilson Homes' payment back to Dan Wilson Homes.  (Trial Tr. vol. 2, 340:17-343:25.)

39.    Dan Wilson Homes then offered full payment of the contract price to Plaintiff for Plaintiff's incomplete work, but Plaintiff rejected such voluntary overpayment.  (Trial Tr. vol. 2, 344:20-345:25.)

40.    The Wilson Defendants made reasonable efforts to resolve all disputes related to Plaintiff's work on the Jeffers plan, the Brown plan, the Showcase Home plan, and the McGee/Winder plan by (1) offering to let Plaintiff complete the plans, (2) bringing Lack back to

14

complete the plans, (3) offering to pay Plaintiff the full contract price on the plans less the cost to the Wilson Defendants to complete the plans, or (4) offering to finish the plans and then bringing the plans back to Plaintiff so that Plaintiff could copyright the plans.  (Trial Tr. vol. 2, 327:14-331:2; 344:20-345:25.)   Plaintiff refused the Wilson Defendant's reasonable efforts to resolve the disputes.  (Trial Tr. vol. 2, 320:21-321:10; 328:19-331:2.)

41.   The Wilson Defendants faced contractual liability and damage to reputation and business goodwill if the drawings were not timely completed.  (Trial Tr. vol. 1, 258:20-259:16; Trial Tr. vol. 2, 273:6-16.)

42.   The total contract price for the Brown residence was $4,678.75, and the Wilson Defendants paid Lack $500 to complete the Brown plans.   (Trial Tr., vol. 1, 137:25 – 138: 17.)

43.   The total contract price for the McGee/Winder residence was $3,935.00, and the Wilson Defendants paid Lack $500 to complete the Brown plans.  (Trial Tr., vol. 1, 138:18 – 139: 4.)

44.   The total contract price for the Jeffers residence was $5,720.00, and the Wilson Defendants paid Lack $4,504.50 to complete the Jeffers plans.  (Trial Tr., vol. 1, 139:22 – 140: 16.)

45.   The total contract price for the Showcase Home residence was $4,375.00, and the Wilson Defendants paid Lack $4,567.50 to complete the Showcase Home plans. (Trial Tr., vol. 1, 139:5 – 21.)

46.   No contract existed between Plaintiff and Dan Wilson Homes with respect to the Scott Residence.  (Trial Tr. vol. 2, 318:11-319:15.)  At the time of Ben Lack's termination from Hunn Design, Dan Wilson had notified that the Scott project might go forward but had not yet authorized Ben Lack to proceed.  (Trial Tr., vol. 1, 180:16 – 181: 4.)

15

47.     No contract existed between Plaintiff and Dan Wilson Homes with respect to the Bradley Residence.  (Trial Tr. vol. 2, 318:11-320:7.)  At the time of Ben Lack's termination from Hunn Design, Dan Wilson had notified that the Bradley project might go forward but had not yet authorized Ben Lack to proceed.   (Trial Tr., vol. 1, 180:16 – 181: 4.)

*Copyright Misuse*

48.     Plaintiff filed the copyrights on the Brown plan, the Jeffers plan, the Showcase Home plan, and the McGee/Winder plan after Plaintiff refused to complete the plans.  (Trial Tr. vol. 3, 599:6-600:4.)

49.     Plaintiff refused to work with the Wilson Defendants on the Jeffers plan, the Brown plan, the Showcase Home plan, and the McGee/Winder plan and at the same time threatened legal action if the Wilson Defendants moved forward with these plans knowing that Wilson Defendants had committed to their clients to complete the plans.  (Trial Tr. vol. 2, 200:22-201:25; Plaintiff's Exhibit 14.)

50.     Plaintiff had never copyrighted any plans prior to copyrighting these plans.  (Trial Tr. vol. 3, 600:9-11.)  Plaintiff sued the Wilson Defendants for millions of dollars.  (Trial Tr. vol. 3, 601:9-13.)

*Counterclaim*

51.     Gary Greenstreet and Lacy Brown hired Dan Wilson to build Lacy's home, based on the detailed plan that Gary drew. (Trial Tr. vol. 2, 286:7-287:13.)  Lacy Brown is Gary Greenstreet's daughter and Gary drew the plans as gift to Lacy and her husband.   (Trial Tr. vol. 3, 701:4-8.)  Gary Greenstreet has considerable experience drawing plans.   (Trial Tr. vol. 2, 287:20-288:4; Trial Tr. vol. 3, 703:20-22.)  Lacy Brown gave her dad the ideas, and Gary drew them. (Trial Tr. vol. 3, 646:8-18).  The drawings were intended for Dan Wilson to be able to hire

a draftsman for dimensioning of the plan; the drawings were never intended for any other use. (Trial Tr. vol. 3, 705:17-706:5.)

52.     Defendants' Exhibit 20 is a copy of the three drawings Gary Greenstreet authored. (Trial Tr. vol. 2, 289:17-291:5; Trial Tr. vol. 3, 646:8-18.)   Gary drew the drawings to scale. (Trial Tr. vol. 3, 704:15-25.)   Gary is the author of these drawings. (Trial Tr. vol. 3, 703:25-704:1.)   Gary was involved in the design process at every step of the way, as was Lacy and her husband Bobby.     (Trial Tr. vol. 2, 291:8-15.)   The draftsman simply had to dimension the Greenstreet drawings; the majority of the work was done.   Gary had even included a site plan and sketch of a front elevation option.   (Trial Tr. vol. 2, 291:19-292:12.)   Gary Greenstreet's drawing was detailed enough to build from. (Trial Tr. vol. 3, 705:3-8.)

53.     Compared with Plaintiff's Exhibit 35, Plaintiff's copy of deposit, the drawing submitted by Marshall Hunn to the copyright office was just a "straighter-line version" of what Gary Greenstreet drew.   (Trial Tr. vol. 3, 706:20-25).   Lacy Brown testified that Exhibit 35 was based upon Gary Greenstreet's drawings in Exhibit 20. (Trial Tr. vol. 3,651:19-652:3).   She further testified there are a lot of similarities between the drawings, other than that one bathroom in Plaintiff's drawing was a little different from Gary Greenstreet's; it was styled in a Jack-and-Jill arrangement. (Trial Tr. vol. 3, 652:9-12; Trial Tr. vol. 3, 707:2-14).

54.     Ben did not contribute in any way to the creation of Gary Greenstreet's drawings, nor did Marshall Hunn. (Trial Tr. vol. 3,650:16-651.)   Nevertheless, Marshall Hunn claimed on his copyright registration that he authored a copy of Gary Greenstreet's drawing.   (Trial Tr. vol. 2, 474:3-13; Trial Tr. vol. 3, 707:17-708:17.)   Marshall Hunn filed copyright on the Gary Greenstreet plan without permission. (*Id.*)   Lacy Brown and Gary Greenstreet gave Ben Lack permission to use the drawings to develop their house, but they did not give Ben Lack

permission to copyright these drawings and claim them as his own on behalf of his employer. (Trial Tr. vol. 2, 292:15-22; Trial Tr. vol. 3, 707:17-708:17.)

55.     Gary Greenstreet assigned his rights to his drawings to Dan Wilson Homes, as evidenced by Defendants' Exhibit 8.  (Trial Tr. vol. 3, 678:17-19).  Gary Greenstreet also assigned his right to pursue the copyright infringement claim.  (Trial Tr. vol. 3, 679:13-23; Trial Tr. vol. 3, 681:14-20).  Dan Wilson Homes registered the assigned Greenstreet drawings effective November 15, 2012, registration number VAu 1-121-022.  (Trial Tr. vol. 3, 692:23-24). The Greenstreet copyright registration shows Gary Greenstreet as the author of the architectural work, and the copyright claimant as Dan Wilson Homes, Inc.  (Trial Tr. vol. 3, 693:15-694:14.) The registration certificate also indicates that the copyright rights were transferred to Dan Wilson Homes from Gary Greenstreet by written agreement. (*Id.*)  The drawing at issue, the first page of Defendant's Exhibit 20 and the drawing copied and used by Plaintiff, was copyrighted by Dan Wilson Homes.  (*Id.*; Trial Tr., vol. 2, 473:23-474:13.)

**B.**
**Supplemental Proposed Conclusions of Law**

***Plaintiff's Copyright Infringement Claims***

56.     Wilson Defendants' use of the plans was licensed, which is a valid affirmative defense to all of Plaintiff's copyright infringement claims.  Wilson Defendants had an implied, nonexclusive license to use the plans copyrighted by Plaintiff to build the residences in question.

57.     Uncontroverted evidence established that the agreements between Plaintiff and Wilson Defendants involved transfer of a license to use the plans to build the residences for which the plans were created.  Plaintiff failed to prove any conditions precedent existed (other than payment) with respect to granting of this license.

58.     Ben Lack was Marshall Hunn's authorized agent with respect to formation of contracts with Dan Wilson Homes.  Ben Lack delivered the plans to Wilson Defendants with the specific understanding that the plans would be used to build the homes in question.  Ben Lack never put any restrictions on use of the plans.  Ben Lack, from his prior work as a draftsman, had the same understanding as Wilson Defendants regarding ownership and future use of the plans: if Wilson Defendants replaced Ben Lack with another draftsman Wilson Defendants might owe money for the work performed, but they would be free to hire another draftsman to complete the plans and use the plans for the purpose the plans were created.  This was because Ben Lack, in agreement with the Wilson Defendants, believed that the plans were created from the homeowners' ideas and the homeowners were the only reason the projects existed.  Marshall Hunn's authorized agent, Ben Lack, had a meeting of the minds with the Wilson Defendants that, if Dan Wilson Homes replaced Marshall Hunn, Dan Wilson Homes would retain the right to complete and use the plans in progress.

59.     Further evidence of the intent of Marshall Hunn to license the plans to Wilson Defendants was presented at trial.  The plans were ordered by Wilson Defendants for use in pre-existing construction projects, Plaintiff had no involvement in the projects other than as a subcontractor draftsman, Plaintiff delivered the plans without written or oral restrictions on their use, and the parties intended for the plans to be used for the overarching purpose of building the homes for which the plans were created.

60.     Given the relationship between Dan Wilson Homes and Hunn Designs, the fact that separate short term oral agreements existed for each project, the lack of written restrictions or oral communications about limits on Dan Wilson's ability to use the delivered documents, the overall goals of the parties and the meeting of the minds between Hunn Designs and Dan Wilson

Homes, a license existed for Dan Wilson Homes to complete and use the delivered documents at issue in this matter. This license was irrevocable due to consideration given by Wilson Defendants for such license. Wilson Defendants' use of the plans copyrighted by Plaintiff was within the scope of the license.

61.     Furthermore, Plaintiff does not have a valid copyright related to the Brown Plan as such plans are copies of Gary Greenstreet's work that has been licensed to Defendant Dan Wilson Homes, Inc. Copyright registration VAu 1-086-266 does not designate Gary Greenstreet as the author and does not claim transfer of copyright from Gary Greenstreet to Marshall Hunn. Existence of a valid copyright is a requirement of an infringement claim; therefore, independent of the license issue, Wilson Defendants did not infringe with respect to the Brown Residence.

62.     Independent of the license issue, the Wilson Defendants did not copy Plaintiff's work on the remaining three residences in question because the plans used by Wilson Defendants for the McGee/Winder Residence, Jeffers Residence, and Showcase Home are not substantially similar to the work copyrighted by Plaintiff.

63.     Independent of the license and infringement issues, there are no direct profits related to the alleged infringing activity. The "sale" of the residences occurred before Plaintiff was hired to draw the made-to-order plans on a subcontractor basis. Furthermore, Plaintiff did not establish a nexus between the alleged infringement and Wilson Defendants' indirect profits. Neither involvement of a draftsman nor use of the plans had an effect on Wilson Defendants' profits because such profits were captured at the inception of the project and were fixed fees that did not depend upon the involvement or lack of involvement of any particular draftsman.

64.     Pursuant to §505 of the Copyright Act, a court may award reasonable attorneys' fees to the prevailing party in a copyright infringement case. 17 U.S.C. § 505. The Wilson

Defendants are entitled to reasonable attorney fees for Plaintiff's failure to prove his infringement claim.

***Plaintiff's Breach of Contract Claims***

65.     No contract existed between the Wilson Defendants and Plaintiff with respect to the Bradley Residence and the Scott Residence.

66.     Regarding the four remaining residences, Plaintiff has failed to meet his burden to prove by a preponderance of the evidence that (1) Plaintiff fully or substantially performed or (2) the Wilson Defendants breached any contracts they had with Plaintiff.

67.     Performance can occur through full performance or substantial performance. *Weitzul Constr., Inc. v. Outdoor Environs.*, 849 S.W.2d 359, 363 (Tex. App.–Dallas 1993, writ denied); *Anderson v. Vinson Expl., Inc.*, 832 S.W.2d 657, 666 (Tex. App.–El Paso 1992, writ denied). Full performance means all contractual duties have been fulfilled and nothing is left to be done. *Weitzul Constr.*, 849 S.W.2d at 363. Substantial performance means that all essential elements of a contract were performed. *Anderson*, 832 S.W.2d at 666. A party tenders performance if it is ready and willing to perform its dependent promise, has the present ability to perform its promise, and notifies the other party of its readiness to perform. *See 17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 256 (Tex. App.–Dallas 2002, pet. denied). Performance must occur within a reasonable time. *HECI Expl. Co. v. Clajon Gas Co*., 843 S.W.2d 622, 634 (Tex. App.—Austin 1992, writ denied).

68.     Plaintiff did not fully perform any of his contracts pertaining to the Jeffers Residence, the McGee/Winder Residence, the Showcase Home, and the Brown Residence. Plaintiff did not substantially perform any of these contracts he had with the Wilson Defendants because all essential elements of the contracts were not performed. Plaintiff   did   not   tender

21

performance on the four residences at issue as noted by his statements on October 11, 2011 to the Wilson Defendants (both in a meeting and in a letter from his attorney) that he did not have the present ability to complete the drawings.

69.     Plaintiff also failed to prove by a preponderance of the evidence that the Wilson Defendants breached the contracts.  If a contract calls for successive acts, first by one party, and then by the other, there is no breach by one party if the precedent act has not been performed by the other party. *Perry v. Little*, 419 S.W.2d 198, 201 (Tex. 1967).

70.     The Wilson Defendants did not breach the contracts pertaining to the four residences at issue because the Wilson Defendants' obligations only arose after Plaintiff performed his contractual obligations.  Plaintiff failed to perform his contractual, so the Wilson Defendants were under no duty to pay until Plaintiff completed the plans.

71.     Additionally, the Wilson Defendants fully performed by requesting that Plaintiff invoice the Wilson Defendants for work performed by Plaintiff, offering to pay Plaintiff for work completed by Plaintiff, and submitting payment to Plaintiff despite never receiving an invoice from Plaintiff.

72.     Plaintiff did not fully perform his duties under the contracts, so the amounts owed under the contracts using the appropriate measure of contract price minus Wilson Defendants' cost to complete results in the following:

a.   Brown Residence: $4,178.75 (contract price minus $500 cost to complete);

b.   McGee/Winder Residence: $3,435.00 (contract price minus $500 cost to complete);

c.   Jeffers Residence: $1,215.50 (contract price minus $4,504.50 cost to complete);

d.   Showcase Home: $0.00 (cost to complete exceeded contract price).

However, these amounts are not awardable as damages in this action because Wilson Defendants did not breach the contracts.

***Unclean Hands***

73.     The Wilson Defendants proved by a preponderance of the evidence that Plaintiff did not have clean hands when dealing with the Wilson Defendants on the plans.  The plaintiff is guilty of inequitable conduct pertaining to the contracts at issue and the inequitable conduct injured the Wilson Defendants, so the plaintiff is precluded from recovering on its breach of contract claim.  *Lazy M Ranch, Ltd. v. TXI Opers., L.P.*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied); *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied).

74.     Plaintiff acted in an inequitable manner by refusing to complete the plans and not giving the Wilson Defendants an option to move forward, all the while knowing that plans must be completed in a reasonable time so that construction of the homes can occur, and if not, that the Wilson Defendants would face liability from the homeowners.

75.     The amounts owed under the contracts (Brown Residence: $4,178.75; McGee/Winder Residence: $3,435.00; Jeffers Residence: $1,215.50; Showcase Home: $0.00), while not awardable as damages in this action, are relevant, however, to Wilson Defendants' equitable defenses.  Dan Wilson Homes submitted payment equal to or in excess of each of these amounts prior to the inception of this lawsuit, which would have made Plaintiff whole.  For purposes of attempting to create causes of action and damages, Plaintiff acted in bad faith by rejecting this submitted payment and failing to make a demand for payment for services provided.  Such actions constitute unclean hands, which bars Plaintiff in equity from recovering any damages relating to his breach of contract claims.

23

***Copyright Misuse***

76.     The Wilson Defendants proved by a preponderance of the evidence that Plaintiff misused the copyrights pertaining to the four residences at issue thereby precluding Plaintiff from recovering on his copyright infringement claims.   The doctrine of copyright misuse prohibits a copyright holder from using a copyright "to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant."  *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792 (5th Cir. 1999).   Plaintiff misused his copyrights by suing for millions of dollars in damages on floor plans to which he did not have a valid copyright and despite there being no substantial similarity between the actual homes and Plaintiff's copyrights.

77.     Plaintiff rejected numerous pre-litigation attempts at resolution by Wilson Defendants that would have made Plaintiff whole and allowed for timely completion of the plans.   Plaintiff did this with knowledge that Wilson Defendants would need to proceed with construction of the residences regardless of any dispute with Marshall Hunn.   Despite Wilson Defendants limiting their use of the plans to construction of the residences in question and in an effort to create causes of action and damages, Plaintiffs claimed millions of dollars' worth of damages based on copyright infringement in a manner he knew or should have known to be inconsistent with his rights.   Such actions constitute copyright misuse, which bars Plaintiff in equity from recovering any damages relating to his copyright infringement claims.

***Plaintiff's Infringement of the Greenstreet Drawings***

78.     Copyright infringement exists if (1) there is the existence of a valid copyright, and (2) the alleged infringer copied constituent elements of the owner's work that are original.  *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). Copying is

demonstrated by factual copying and substantial similarity. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004).

79.     The Wilson Defendants established by a preponderance of the evidence that they hold a valid copyright in the Greenstreet floor plan drawn by Gary Greenstreet. Gary Greenstreet drew the original work then assigned his rights in the Greenstreet drawing to Dan Wilson. The Greenstreet drawing was registered with the U.S. Copyright Office by Dan Wilson.

80.     Plaintiff copied constituent elements of the copyrighted Greenstreet drawing as shown by Plaintiff's submission of a substantially similar drawing to Gary Greenstreet's drawing in its copyright deposit materials to the Copyright Office.  The plaintiff's copyrighted work was only a "straighter-line version" with a change in configuration of a small percentage of the overall floor plan.

81.     Plaintiff was never given permission by Dan Wilson Homes or Gary Greenstreet to copyright the Greenstreet floor plan as Plaintiff's own. The intent of the parties was that Plaintiff only had permission to dimension the Greenstreet drawing in a computer-generated format to fit the lot for the Wilson Defendants and to perform other wholly functional work. Plaintiff was not authorized to copyright the Greenstreet material as his own for his own personal gain.

82.     Plaintiff infringed on Wilson Defendant's copyright and committed copyright misuse by submitting to the Copyright Office copies of drawings substantially similar to Wilson Defendant's Greenstreet and claiming those drawings as his own.

83.     The Copyright Act allows the copyright owner to elect at any time before final judgment statutory damages for the infringement of his rights. 17 U.S.C. § 504(c).  The Wilson Defendants have elected to recover statutory damages under 17 U.S.C. § 504(c) for Plaintiff's

infringement of the Wilson Defendants' copyright.  The Court finds that Wilson Defendants suffered significant harm in having to respond to this lawsuit where Plaintiff sued Wilson Defendants wrongfully claiming copyright ownership of the Greenstreet drawing and awards Wilson Defendants $30,000.00 in statutory damages.

84.     Pursuant to §505 of the Copyright Act, a court may award reasonable attorneys' fees to the prevailing party in a copyright infringement case. 17 U.S.C. § 505. The Wilson Defendants are entitled to reasonable attorney fees for Plaintiff's infringement of their copyright.


WHEREFORE, Defendants Dan Wilson and Dan Wilson Homes, Inc. respectfully urge the Court to adopt the Supplemental Proposed Findings of Fact and Conclusions of Law.

Respectfully Submitted,

/s/ William P. Lane

WILLIAM P. LANE
State Bar No. 11888250
DUSTIN R. BURROWS
State Bar No. 24048375
MARION SANFORD III
State Bar No. 24027828
McCLESKEY, HARRIGER, BRAZILL
        & GRAF, L.L.P.
P.O. Box 6170
Lubbock, Texas 79493-6170
Phone: (806) 796-7332
Fax: (806) 796-7365

ATTORNEYS FOR DEFENDANTS, DAN
WILSON HOMES, INC. AND DAN WILSON

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he served the above and forgoing document in accordance with all applicable procedural rules on all counsel of record on this 29th day of November, 2013.


<u>/s/ Marion Sanford III</u>
Marion Sanford